AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of Virginia



In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )  Case No.  1:18-SW-307
AN APPLE IPHONE IMEI: 358821053188865, )
CURRENTLY LOCATED AT 9325 DISCOVERY BLVD. )
MANASSAS, VA 20109 )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A

located in the _____Eastern_____ District of _____Virginia_____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. Sections 841 & 846; | Conspiracy to distribute controlled substances; Obstruction of Justice |
| 18 U.S.C. Sections 1512 & 2 | |

The application is based on these facts:
See Attached Affidavit

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA/SAUSA:

| SAUSA David A. Peters |
|---|

_____
*Applicant's signature*

Task Force Officer John Mocello, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____06/01/2018_____

/s/
Michael S. Nachmanoff
United States Magistrate Judge
*Judge's signature*

City and state: Alexandria, Virginia

The Honorable Michael S. Nachmanoff
*Printed name and title*

## ATTACHMENT A

The property to be searched is an Apple iPhone, Model: A1532, IMEI number 358821053188865, hereinafter the "Device." The Device is currently located at FBI Northern Virginia Resident Agency ("NVRA"), 9325 Discovery Blvd. Manassas, VA 20109.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.      All records on the Device described in Attachment A that relate to violations of Title 21, United States Code, Sections 841 and 846 and involve Joseph Riley Curry (CURRY) since January 1, 2016, including:

  a.   Assigned telephone number, push-to-talk number, and email address;

  b.   Contact list, recent call list, missed call list, and incoming call list;

  c.   Stored text messages, stored photos, and stored videos

  d.   Lists of customers and related identifying information;

  e.   Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

  f.   Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

  g.   Any information recording CURRY's schedule or travel from January 1, 2016, to the present;

  h.   All bank records, checks, credit card bills, account information, and other financial records.

2.      Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.



IN THE UNITED STATES DISTRICT COURT
FOR EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF AN APPLE IPHONE IMEI: 358821053188865, CURRENTLY LOCATED AT 9325 DISCOVERY BLVD. MANASSAS, VA 20109 | Case No. 1:18-SW-307<br><br>The Honorable Michael S. Nachmanoff |

### AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, John M. Mocello, a Task Force Officer (TFO) of the Federal Bureau of Investigation, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a detective with the Leesburg (Virginia) Police Department ("LPD"). I have been employed as a police officer in the Commonwealth of Virginia since 2007. I have been a detective in the Criminal Investigations Section of LPD since September 2013. Since June 2015, I have been a TFO with the FBI's Safe Streets Task Force in Manassas, Virginia.

3.      I am "an investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States

who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18 of the United States Code.

4.      I have extensive experience investigating violations of federal and state narcotics laws.  I have conducted and participated in numerous narcotics investigations resulting in the arrest and conviction of drug distributors, and seizure of quantities of controlled substances. Many of these investigations have involved the distribution and use of cocaine, cocaine base (commonly known as crack cocaine), methamphetamine, and heroin.  I have received extensive training in drug identification, drug distribution methods, and drug enforcement techniques from both state and federal agencies.  As a result, I am familiar with the use, effects, distribution techniques, appearance, and method of manufacture of controlled substances, including cocaine, crack cocaine, methamphetamine, and heroin.

5.      I have participated in the execution of numerous search warrants and have sworn to numerous affidavits in support of arrest warrants and search warrants for illegal narcotics, paraphernalia related to the use of illegal narcotics, monies or proceeds derived from the sale of narcotics, electronic devices used in furtherance of the sale of illegal narcotics, and records, ledgers and documents pertaining to the purchase and sale of controlled substances.

6.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

7.      The property to be searched is an Apple iPhone, Model: A1532, IMEI number 358821053188865, hereinafter the "Device."  The Device is currently located at FBI Northern Virginia Resident Agency ("NVRA"), 9325 Discovery Blvd. Manassas, VA 20109.

2

8.      The applied-for warrant would authorize the forensic examination of the Device

for the purpose of identifying electronically stored data particularly described in Attachment B.

**PROBABLE CAUSE**

9.      In or around October, 2016, the Federal Bureau of Investigation (FBI), the

Loudoun County Sheriff's Office (LCSO) and the Leesburg Police Department (LPD) detectives

began investigating CURRY's involvement in the distribution of heroin and fentanyl in Loudoun

County, Virginia, within the Eastern District of Virginia.      Investigators interviewed two

individuals, cooperating defendant 1 (CD-1)[1] and cooperating defendant 2 (CD-2)[2], regarding

their narcotics dealings with CURRY.      Additionally, law enforcement used a Confidential

---

[1] In 2017, CD-1 pled guilty in the Eastern District of Virginia to a one-count criminal
information charging him with obstruction of justice in relation to his narcotics relationship with
CURRY. CD-1 is cooperating pursuant to a plea agreement with the government in the hopes of
receiving a reduction in his adjudged sentence. CD-1 has been cooperating with law
enforcement since March 2016. CD-1 has prior state convictions for drug related offenses. CD-
1 provided incomplete information in his initial interactions with law enforcement. However,
after voluntarily meeting with law enforcement and in proffering pursuant to the plea agreement,
CD-1 has provided information, the completeness and validity of which law enforcement has
been able to corroborate. CD-1 chose to stop cooperating with law enforcement based on a state
charge, the existence of which pre-dated the initiation of CD-1's cooperation before pleading
guilty. For these reasons, I consider CD-1's information to be reliable.

[2] In 2017, CD-2 pled guilty in Loudoun County Circuit Court to a felony offense for involuntary
manslaughter related to his narcotics relationship with CURRY. CD-2 is cooperating pursuant to
a plea agreement with the government in the hopes of receiving a reduction in his adjudged
sentence. CD-2 has been cooperating with law enforcement since March 2016. CD-2 has prior
state convictions for drug related offenses. The information CD-2 initially provided law
enforcement was incomplete. However, after voluntarily meeting with law enforcement and in
proffering pursuant to the plea agreement, CD-2 has provided information, the validity and
completeness of which law enforcement has been able to corroborate. For these reasons, I
consider CD-2's information to be reliable.

Source (CS-1)[3] to conduct a controlled purchase with CURRY, which occurred on May 9, 2016. During that controlled purchase, the CS-1 purchased approximately 1 gram of fentanyl, a Schedule II controlled substance, from CURRY for approximately $240.00. The CDs and CS will be referred to in the masculine regardless of their true genders.

### INTERVIEW OF CD-1

10.     On March 29, 2016, CD-1 was interviewed by investigators at his residence in Round Hill, Virginia. During the interview, CD-1 admitted to purchasing heroin from CURRY on more than fifteen occasions. CD-1 believed CURRY was a sub-distributor for other dealers. CURRY charged CD-1 approximately $40.00 for approximately 0.15 grams of heroin. CD-1 admitted to purchasing $275.00 worth of heroin from CURRY and an unindicted co-conspirator (UCC-1) on or about March 18, 2016. CD-1 further admitted to providing a portion of that heroin to a friend, E.L., who died on or about March 18, 2016, after ingesting the heroin CD-1 purchased from CURRY and UCC-1. A subsequent toxicological examination of fluids taken from E.L. confirmed the presence of heroin. Following an autopsy, the Office of the Chief Medical Examiner determined that E.L died from accidental heroin poisoning.

11.     Before the March 29, 2016, interview, CD-1 agreed to conduct a controlled purchase with CURRY. CD-1 attempted to arrange this controlled purchases through text messages sent over a cellular telephone.

---

[3] CS-1 has been a confidential source since 2016. CS-1 is not facing criminal charges nor is he seeking relief from any sentence of confinement. CS-1 is not cooperating for financial gain. CS-1 voluntarily offered to assist law enforcement in investigating narcotics crimes in Loudoun County. CS-1 is a former heroin customer of CURRY who has been battling addiction. CS-1 has never provided information that law enforcement has found to be false or incomplete. For these reasons, I consider CS-1 reliable.

4

12.     On April 19, 2016, law enforcement examined text messages on CD-1's cellular telephone with CURRY.   CD-1 engaged in these communications at the direction of law enforcement.   Leesburg Police Department detectives obtained a Commonwealth of Virginia search warrant on April 19, 2016, for CD-1's cellular telephone.   All text messages obtained from the search warrant were at the direction of LCSO.   The following is an excerpt of the conversation between CURRY and CD-1 on March 23, 2016:

CURRY: Stop giving attitude [CD-1]

CD-1: What attitude?? Smh

CD-1: Dude what's up with [UCC-1]? Is he ok?

CD-1: Well since [UCC-1] is totally faking on me for some reason can I get something off you?

CD-1: ?????

CURRY: Why are you blowing me up people's phones looking for me dude?

CURRY: I'm not [UCC-1]

CD-1: What? I'm just trying to cop something

CURRY: I'll trade for addies

CD-1: Really I don't have many left but I got cash

CURRY: what do you need

CD-1: What you want for a g?

CURRY: 240

CD-1: Damn that's steep…   Well someone just hit me back that's available now so ima grab something small to get me by tonight but I can meet up with you tomorrow like for sure?  I know you got the good shit lol

13.     Based on my training and experience, and knowledge of the case, I believe CD-1 and CURRY were arranging a transaction for approximately 1 gram of heroin for $240.00 after CD-1 could not reach UCC-1.  I further believe that CD-1 believed that CURRY would provide powerful heroin.

14.     The following is an excerpt of the conversation between CD-1 and CURRY from March 26, 2016:

> CURRY: I've got some of that really good shit
>
> CURRY: Heard [UCC-1] blocked you lol
>
> CURRY: So hmu if u want some
>
> CD-1: Wtf why he block me?  I'm broke right now but thanks for the heads up
>
> CURRY: Because he said you were blowing him up, being rude as fuck and disrespectful.  Said you didn't have any patience and you would like harass him if he didn't come and serve you immediately.

15.     Based on my training and experience, and knowledge of the case, I believe UCC-1 informed CURRY that he would no longer deal with CD-1.  In response, I believe CURRY offered to provide CD-1 heroin.

16.     The following is an excerpt of the conversation between CD-1 and CURRY from March 28, 2016:

> CURRY: Do u want anything
>
> CURRY: I have that everybody overdosing type shit

17.     Based on my training and experience, and knowledge of the case, CURRY offered to sell CD-1 heroin that was powerful enough to cause an overdose.

6

18.     The following is an excerpt of the conversation between CD-1 and CURRY from April 4, 2016:

CURRY: Hey

CURRY: I got dope

CURRY: GOOD dope. Way better shit than you've ever gotten from me before

CURRY: [CD-1]

CURRY: Do u want anything

CURRY: Are you getting my texts?

19.     Based on my training and experience, and knowledge of the case, I believe CURRY was, again, offering to sell CD-1 strong heroin.

**INTERVIEW WITH CD-2**

20.     On or about March 1, 2016, law enforcement interviewed CD-2 in Leesburg, Virginia. CD-2 told LPD Detectives he had purchased heroin from CURRY between February 29, 2016 and March 1, 2016. CD-2 later admitted to providing a portion of the substance he obtained from CURRY to a friend, J.C., who died on or about March 1, 2016, after ingesting that substance. A subsequent toxicological examination of fluids taken from J.C. confirmed the presence of fentanyl. The Office of the Chief Medical Examiner determined that J.C. died from accidental fentanyl, morphine, and ethanol poisoning.

21.     CD-2 admitted that he provided CURRY $100.00 for approximately 0.4 grams of suspected heroin. Before the purchase, CD-2 used a portion of the substance he obtained from CURRY at CURRY's residence in Leesburg, Virginia, and lost consciousness. CD-2 did so at CURRY's insistence. CD-2 admitted that when he regained consciousness, he was on the outdoor steps leading to CURRY's basement. CD-2 believes that after he lost consciousness,

7

CURRY dragged him from the residence and placed him outside. Investigators photographed injuries, including scrapes to CD-2's back and legs, that appear to have resulted from being dragged over concrete.

22.     Once CD-2 awoke, CD-2 left CURRY's residence and provided the substance he purchased from CURRY to friends, including J.C.

23.     Law enforcement learned CD-2 arranged the heroin transaction with CURRY using Facebook Messenger. On March 8, 2016, law enforcement obtained a Commonwealth of Virginia search warrant for both CD-2's and CURRY's Facebook accounts. With respect to CURRY's Facebook account, the warrant authorized, *inter alia*, the search and seizure of messages from 5:00 p.m. on February 29, 2016, through 3:00 p.m. on March 1, 2016. The following is an excerpt of the messages exchanged by CD-2 and CURRY between February 29, 2016 and March 1, 2016:

CD-2: Word. Well I'm trying to see if you know where anything's at?

CD-2: Dude you can preach to me all you want but whatever I get it. Can you find shit? And if so are you willing to help me out? No I'm the one who went out to find it and put the needle in my arm.

CD-2: I'm looking for a gram

CURRY: I dont like people popping up out of the blue that I havent fucked with in years

CURRY: normally in loudoun county when this kinda thing happens it someone getting set up

CURRY: i dont really have a g like that

CURRY: just how much are u tryin

CURRY: to spend

8

CD-2: I get it I really do. I have been in st Augustine Florida for rehab. I'm tryin to spend

$100

CURRY: aight

CURRY: well I cant give u a g for that

CD-2: What can you do?

CURRY: u can come through with that and get .4

CURRY: im in woodlea

CD-2: For 100?

CD-2: The most I'll do for that is 60

CURRY: alrighty

CURRY: lol

CD-2: So 60

CURRY: no

CURRY: just lemme know if u want what I said

CD-2: You really want 100 for .4?

CURRY: yes

CURRY: were not in the city dude

CD-2: Aware

CURRY: im not trying to sell .4 for 60 and not actually profit

CD-2: What about 80?

CURRY: its not some bullshit shitty dope either…and it's on point

CURRY: do u have 0 tolerance right now?

CURRY: if your tolly is at 0 then .4 will give you 4 nice ass shots

9

CURRY: in fact I would prefer to be there with you when you do ur first shot

CURRY: just come on and ill give u something worth your while for 100 dude

CD-2: Alright

CD-2: I'll be there in 10

CURRY: ur not a fucking snitch right

CD-2: Nah dud lol

24.     Based on my training and experience, and knowledge of the case, I believe CD-2 and CURRY were arranging a transaction for approximately 0.4 grams of heroin for $100.00. I further believe that this transaction occurred at the 635 Meade Drive, SW., Leesburg, Virginia 20175 – CURRY's residence and that of his family.  I further believe CURRY established his quoted price in order to make a profit from the sale of this substance.  I further believe that CURRY believed his product was strong.

## INTERVIEW OF CS-1 AND CONTROLLED PURCHASE WITH CURRY

25.     In or around April 2016, law enforcement began working with a confidential source (CS-1) who claimed to have purchased heroin from CURRY in the past.  CS-1 agreed to conduct a controlled purchase with CURRY.

26.     On May 9, 2016, at law enforcement's direction, CS-1 arranged to purchase approximately 1 gram of heroin from CURRY for approximately $240.00.  The CS contacted CURRY over text messages to arrange the purchase. CURRY used a cellular telephone with assigned call number (703) 973-7562 to communicate with CS-1. Law enforcement has screen shots of those communications. The following is an excerpt of the discussion between CS-1 and CURRY beginning on May 8, 2016 and ending on May 9, 2016:

CS: Think you'll be good tomorrow?

10

CURRY: Ya

CS: Could you do something early? Like 11?

CS: ?

CS: What's up man?

CS: I have a limited window tomorrow but would like to get a gram.  Let me know if 11am works.

CURRY: Ya ok

CURRY: A gram is gna cost 240 though

CS: Word.  No problem.  I'll hit you up when I'm headed your way.

27.    Based on my training and experience, and knowledge of the case, I believe CURRY agreed to provide CS-1 with 1 gram of heroin for $240.  CS-1 agreed to contact CURRY when he was nearby.

28.    On May 9, 2016, law enforcement met with CS-1 before the transaction.  After searching him and his vehicle for contraband (with negative results) law enforcement provided CS-1 with $240.00 to complete the purchase.  Law enforcement established surveillance at the suspected location of the deal—635 Meade Drive, SW., Leesburg, Virginia 20175.  On May 9, 2016, CS-1 and CURRY, who was still using the cellular telephone with assigned call number 703-973-7562, exchanged the following text messages:

CS-1: Leaving soon. You up?

CS-1: Yo What's up??

CS-1: You said you could do something at 11.  I'm about to leave bro.

CS-1: I don't have much time

CS-1: Wake up son!

11

CS-1: Riley. Come on man

CS-1: Riley!

CS-1: Yo!

CS-1: Hit me up

CS-1: Hit me up as soon as you wake up man.

CURRY: C'mon through

CS-1: Cool.  Gimmie 15

CS-1: Yo. I'm here

CS-1: What's up

CURRY: If you start doing this shit again then you can sit and wait longer its no skin off

my teeth

CS-1: All right bro. Damn.

CS-1: I'm here.  Whenever your ready

CURRY: I'm just waiting for my dad to go downstairs

CS-1: K

CURRY: Just pull right up behind my car

29.     On May 9, 2016, law enforcement observed the transaction between CS-1 and

CURRY.  Specifically, law enforcement witnessed CURRY exit the 635 Meade Drive, SW.,

Leesburg, Virginia 20175 and meet with CS-1 at his vehicle.  Law enforcement watched CS-1

and CURRY conduct a hand-to-hand transaction, and then observed CURRY return inside the

635 Meade Drive, SW., Leesburg, Virginia 20175.  The transaction was video-recorded.

30.     Law enforcement met with CS-1 following the transaction.  CS-1 provided law

enforcement the substance he obtained from CURRY and confirmed that the individual who

12

provided the substance was, in fact, CURRY. Subsequent laboratory testing revealed that the substance obtained during the controlled purchase was approximately 1 gram of fentanyl.

### Target Letter and Jail Calls Regarding CURRY's Cellular Device

31.     In August 2017, the Loudoun County Sheriff's Department arrested CURRY for a state felony drug distribution offense. Thereafter, CURRY was detained at the Loudoun County Adult Detention Center. CURRY pleaded guilty to that charge in Loudoun County Circuit Court. On April 30, 2018, that Court sentenced CURRY to five years of incarceration, with three years and four months of that sentence suspended, followed by five years of supervised probation.

32.     On or about August 9, 2017, the United States Attorney's Office for the Eastern District of Virginia served CURRY, via his lawyer, with a letter informing him he was the target of a federal investigation. That letter informed CURRY he had until September 1, 2017, to contact the United States Attorney's Office to discuss a resolution to his case.

33.     On or about March 28, 2018, the Loudoun County Adult Detention Center provided law enforcement with two discs containing CURRY's recorded jail calls. Law enforcement obtained these discs pursuant to a subpoena issued by the grand jury sitting in the U.S. District Court for the Eastern District of Virginia. I have reviewed the calls contained on these discs.

34.     On or about August 30, 2017, CURRY made a recorded call from Loudoun County Adult Detention Center to a woman, believed to be his mother, at telephone number (703) 777-8606. During this call, CURRY and his mother discussed CURRY's cellular telephone. CURRY's mother told CURRY that his father got the telephone's screen fixed. CURRY asked why they were fixing his phone. CURRY's mother explained that they wanted to

13

keep the telephone and the information contained therein because they thought it might be "worth your while" and "it might be better for you." In discussing the communications on the phone, CURRY's mother explained, "We are not talking hundreds of thousands of dollars of stuff you know, you're pretty small-time." CURRY agreed that his mother should keep the phone.

35.    Based on my training, experience, and knowledge of this investigation, I believe CURRY's mother decided to keep CURRY's cellular telephone because she believed the information contained therein would show he was not a high-level drug dealer. I further believe that she did so with CURRY's consent.

36.    Later in that same recorded telephone call, CURRY's mother stated that CURRY's father would be "following up with that lawyer today" and remarked that "September 1st is the day after tomorrow[.]" CURRY responded saying the lawyer still "had time[.]" CURRY's mother then said that if CURRY spoke to his lawyer to let her know because she "want[s] to find out what's going on because I'm just as in the dark as you are[.]"

37.    Based on my training, experience, and knowledge of this investigation, I believe CURRY's mother was referencing the September 1, 2017, deadline to contact the United States Attorney's Office, as set in the August 9, 2017, target letter. Furthermore, based on the foregoing, I believe that the full context of the recorded jail call on August 30, 2017, shows that CURRY's mother decided to keep CURRY's cellular telephone because CURRY was a target of a federal investigation. The United States Attorney's Office for the Eastern District of Virginia has not yet charged CURRY in connection with its ongoing investigation of his drug-trafficking activities. Therefore, I believe that CURRY's mother is still in possession of CURRY's cellular telephone.

## CONNECTION BETWEEN (703) 777-8606 AND 635 Meade Drive, SW., Leesburg, Virginia 20175

38.     On May 21, 2018, Verizon responded to an administrative subpoena requesting subscriber information for telephone number (703) 777-8606 for the period of January 1, 2016, through May 14, 2018.   In its response, Verizon indicated that this number is a landline subscribed to "Phil Curry" at 635 Meade Drive SW, Leesburg, Virginia 20175. Based on my knowledge of this investigation, I believe "Phil Curry" is CURRY's father. Therefore, I further believe that in the recorded calls referenced above, CURRY called his mother at the telephone associated with the family home at 635 Meade Drive, SW., Leesburg, Virginia 20175. Based on the forgoing, I believed that CURRY's parents are maintaining possession of CURRY's cellular telephone at their home.

## EXECUTION OF SEARCH WARRANT AT 635 Meade Drive, SW., Leesburg, Virginia 20175, AND ACQUISITION OF DEVICE.

39.     On May 24, 2018, the Honorable John F. Anderson, United States Magistrate Judge for the Eastern District of Virginia, issued a search warrant which authorized law enforcement to search 635 Meade Drive, SW., Leesburg, Virginia, to recover and forensically examine CURRY's cellular telephone with assigned call number (703) 973-7562.

40.     On May 25, 2018, law enforcement executed the search warrant.  I knocked and announced law enforcement's presence.  I was greeted at the front door by Susan Vinet – CURRY's mother.  I provided her a copy of the warrant and explained that law enforcement was there solely to obtain CURRY's cellular telephone. Ms. Vinet provided law enforcement with the following cellular telephone: Apple iPhone, Model: A1532, IMEI number 358821053188865.  She further asserted that this was CURRY's cellular telephone and that she had examined its contents.  I determined that this cellular telephone was not assigned call

15

number (703) 973-7562. Ms. Vinet refused my request to seize the device based on her consent.

I seized it based on exigent circumstances, to wit: my fear that leaving the device in Ms. Vinet's

possession could result in its destruction and, thus, the loss of evidence.

41.     The Device is currently in the lawful possession of the FBI based on the

circumstances described in paragraph 40. Therefore, while the FBI might already have all

necessary authority to examine the Device, I seek this additional warrant out of an abundance of

caution to be certain that an examination of the Device will comply with the Fourth Amendment

and other applicable laws.

42.     The Device is currently in storage at the FBI NVRA, 9325 Discovery Blvd.

Manassas, VA 20109. In my training and experience, I know that the Device has been stored in

a manner in which its contents are, to the extent material to this investigation, in substantially the

same state as they were when the Device first came into the possession of the FBI.

## TECHNICAL TERMS

43.     Based on my training and experience, I use the following technical terms to

convey the following meanings:

    a.  Wireless telephone: A wireless telephone (or mobile telephone, or cellular

        telephone) is a handheld wireless device used for voice and data communication

        through radio signals. These telephones send signals through networks of

        transmitter/receivers, enabling communication with other wireless telephones or

        traditional "land line" telephones. A wireless telephone usually contains a "call

        log," which records the telephone number, date, and time of calls made to and

from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

c.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international

borders, even when the devices communicating with each other are in the same state.

44.     Based on my training, experience, and research, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

45.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

46.     *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

   a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

18

b. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

c. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

d. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

47. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

19

48.     *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

49.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

John M. Mocello
Task Force Officer
Federal Bureau

Subscribed and sworn to before me on June 1, 2018

/s/
Michael S. Nachmanoff
United States Magistrate Judge
The Honorable Michael S. Nachmanoff
United States Magistrate Judge
Eastern District of Virginia

20

## ATTACHMENT A

The property to be searched is an Apple iPhone, Model: A1532, IMEI number 358821053188865, hereinafter the "Device." The Device is currently located at FBI Northern Virginia Resident Agency ("NVRA"), 9325 Discovery Blvd. Manassas, VA 20109.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.      All records on the Device described in Attachment A that relate to violations of Title 21, United States Code, Sections 841 and 846 and involve Joseph Riley Curry (CURRY) since January 1, 2016, including:

    a.   Assigned telephone number, push-to-talk number, and email address;

    b.   Contact list, recent call list, missed call list, and incoming call list;

    c.   Stored text messages, stored photos, and stored videos

    d.   Lists of customers and related identifying information;

    e.   Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

    f.   Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

    g.   Any information recording CURRY's schedule or travel from January 1, 2016, to the present;

    h.   All bank records, checks, credit card bills, account information, and other financial records.

2.      Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.